JOHN W. PRY

*v.*

JOHN PRY, Sr. *et al.*

*Filed at Mt. Vernon January 22, 1884.*

1. FORGED DEED—*what amounts to a forgery—erasure of name of one of several grantees.* Where a person took a deed for land to one of his sons, and also to a grandson of the same name as his own, except the addition of a middle initial letter, the grantees being minors, and the grandfather, the custodian of such deed, after the death of his son, one of the grantees, erased his name, and the letter "W" in the other grantee's name, from the deed, and put the deed, so altered and changed, on record, thereby showing a conveyance to himself, the grandfather, it was *held*, that the erasure was a forgery, and as such did not affect the legal or equitable title of the real grantees.

2. SAME—*rights of subsequent purchaser without notice.* A deed was made to John W. Pry and Hamilton Pry, for a tract of land, and placed in the hands of John Pry, a relative, for them, they being infants, after which the depositary erased from the deed the name of Hamilton Pry, and the letter "W" in the name of the other grantee, and placed the same on record. He then conveyed various parts of the land to innocent purchasers, who had no notice of the erasure in the deed, or the forgery: *Held*, on bill filed by John W. Pry to set aside the several conveyances as to his undivided half, as clouds upon his title, and to restore the evidence of his title, that he was entitled to the relief sought, his equitable title being prior in point of time, and he also having the legal title.

3. SAME—*application of the Recording law.* The provision of the statute making all deeds and other instruments affecting the title to land, void as to subsequent purchasers and creditors without notice, if not recorded in

proper time, has no application to forged deeds and other instruments, as they can not affect the title to land, and are therefore not entitled to record.

4. ALLEGATIONS AND PROOFS—*as to the character of title.* A bill in chancery to set aside certain conveyances of land made by one who had forged a deed by the erasure of the name of one of the grantees, alleged that the land was conveyed to the complainant and another, jointly, while the proof showed simply an ordinary deed to them, whereby they took as tenants in common, and not as joint tenants: *Held,* that the error was of such a technical character that a decree would not be reversed for it, especially when no such objection was made in the court below.

5. PRACTICE—*time to object.* In a case of a defective allegation of title, as, stating a joint estate instead of a tenancy in common, as shown by the proofs, a party, to take advantage of it, must make his objection in the court below, so as to afford his adversary an opportunity to amend, and failing to do so, will be held to have waived the objection. But this rule has no application when a material allegation has been omitted, or when the error goes to the substance or merits of the case.

6. DESCRIPTION *of land in a deed—sufficiency.* A description of land in a deed as fifteen acres, "commencing at the N. W. of the N. W. S. E. of section 19," etc., "and running south," etc., is clearly void for uncertainty in the starting point; and a description, "the S. $\frac{1}{2}$ of the N. E. $\frac{1}{4}$ of the S. E. $\frac{1}{2}$" of section 19, etc., is also fatally defective. By making the "S. E. $\frac{1}{2}$" the "S. E. $\frac{1}{4}$," the description would be good.

WRIT OF ERROR to the Circuit Court of Franklin county; the Hon. DANIEL M. BROWNING, Judge, presiding.

The bill in this case charges, in substance, that William Pry, the father of John W. Pry, the complainant, on the 13th of August, 1862, enlisted as a soldier in the service of the United States, for three years; that about the 1st of May, 1864, the former, being then with the army in the State of Georgia, wrote to John Pry, Sr., the father of the said William, and grandfather of complainant, at Frankfort, Franklin county, this State, directing him to sell and convert into money certain personal property then in his possession, and belonging to the said William, and to invest the proceeds thereof, together with about $50 then in his hands belonging to the said William, in the south-east quarter of section 19, town 7 south, range 3 east, of land in said county, belonging

to one Bailey Martin, being of the value of $200, and also directing him to have the deed for the land made jointly to complainant and Hamilton Pry, a minor son of the said John Pry, Sr.; that in pursuance of these directions the said John Pry, on the 5th of August, 1864, purchased of the said Bailey Martin the above mentioned quarter section of land, at the said sum of $200, and paid for the same with the proceeds of said property and the money then in his hands belonging to the said William, as above stated; that the said Bailey Martin and wife, by a good and sufficient deed of that date, conveyed the land in question to complainant and the said Hamilton, in conformity with the directions of the said William, and that upon its execution and acknowledgment it was handed by the grantors to the said John Pry, Sr., to be kept by him for the use of the grantees therein, complainant being then an infant about three years of age, and the said Hamilton, his uncle, near seventeen; that the said Hamilton Pry, in the month of September, 1864, died intestate, without any children or descendants of children; that shortly after Hamilton's death, and before the deed from Martin to him and complainant had been put on record, the said John Pry fraudulently erased the "W" in complainant's name, and the name of Hamilton Pry altogether, from said deed, thereby making it in form a deed to himself, instead of to complainant and the said Hamilton, as originally written; that afterwards, to-wit, on the 22d of August, 1871, with a like fraudulent purpose, he caused the same, in its altered form, to be recorded as a deed from Martin and wife to himself; that after the said William's return from the army, and before said fraudulent deed was recorded, to-wit, on the 2d of March, 1865, the said John Pry, Sr., by quitclaim deed of that date, fraudulently conveyed to the said William the west half of said quarter section of land, and again on the 20th of September, 1871, by a like deed, conveyed to him another portion of the land in controversy; that on the 7th day of

February, 1872, the said John conveyed, by quitclaim deed to John Pry, Jr., a son of the said John Pry, Sr., a portion of the east half of said quarter section. The bill also shows that various other parties were in possession of different parts of said tract of land, all of whom claim title, mediately or immediately, from said John Pry, Sr., through deeds executed since the said 5th day of August, 1864, when the same was conveyed by the said Martin and wife to complainant and the said Hamilton Pry, as heretofore stated, all of whom are made parties to the bill. The bill prays to have the original deed from Martin and wife, and the record thereof, corrected, and that the title to said lands be confirmed in complainant; that said deed in its altered form, and all subsequent deeds from the said John Pry to said land, or from those claiming through him, be declared null and void, and set aside as clouds on complainant's title, and that the defendants be required to account for the rents and profits.

The defendants filed a joint and several answer to the bill, denying the alteration and forgery therein charged, and the defendants other than John Pry, Sr., who disclaimed all interest in the land, set up the defence they were purchasers for a valuable consideration, without notice of complainant's rights. To this answer a general replication was filed, and the cause was heard upon bill, answer, replication and proofs, resulting in a decree finding that the land in question was conveyed by Martin and wife, on the 5th of August, 1864, to complainant and Hamilton Pry, and that John Pry, Sr., subsequently altered and changed the deed in manner and with the intent charged in the bill; but further found that all the defendants other than John Pry, Jr., were purchasers for a valuable consideration, without notice of complainant's rights, and for that reason dismissed the bill as to them. As to John Pry, Jr., the decree was in conformity with the prayer of the bill, the court having found that he purchased with knowledge of the alteration of Martin's deed. The complain-

ant prosecutes this writ of error to reverse the decree of the circuit court in dismissing the bill as to part of the defendants, and in subordinating his rights to theirs on the ground they were innocent purchasers.

Mr. George C. Ross, and Mr. Chas. H. Layman, for the plaintiff in error.

Mr. F. M. Youngblood, and Mr. W. J. N. Moyers, for the defendants in error.

Mr. Justice Mulkey delivered the opinion of the Court:

Two questions arise on this record,—one of law, the other of fact: First, does the evidence sustain the findings of the decree,—or, differently put, do the proofs sustain the case made by the bill; and second, assuming the findings of the decree are warranted by the proofs, can the decree, as matter of law, be sustained. We will consider these questions in the order stated.

It is conceded the deed from Martin and wife, as originally written, was made to complainant and Hamilton Pry, and that it was subsequently altered by striking out the "W" in complainant's name, and the name of Hamilton Pry altogether. So far there is no controversy. The case, upon the evidence, therefore hinges upon the question whether the alterations in the deed took place before or after its execution. The evidence bearing on this issue is too voluminous to be set out *in extenso*. We must therefore content ourselves with giving a summary of what we regard as the substance of it.

By agreement of parties the original deed is submitted for our inspection. After a careful examination of it we are unable to discover anything in the character of the alterations which are manifest on the face of it, that satisfactorily indicates when the alterations were made,—whether before or after

delivery.    William Furgerson, the first witness in the case,
testifies to a conversation between himself and John Pry, Sr.,
in April, 1883, in which the latter told him that William Pry
wrote to him to buy the land and have the deed made to com-
plainant, but in the same conversation claimed the erasures
in the deed were made at the time of its execution, and be-
fore it was signed by the grantors.    Munroe C. Neal, a son-
in-law of John Pry, Sr., testifies to a conversation with him
in 1879, in which the latter stated, in substance, that William
Pry wrote to him to have the deed made to complainant and
Hamilton Pry, and that it was so made out.    W. M. Walker
swears that in 1869 John Pry, Sr., told him that when com-
plainant became of age the land would belong to him; that
his father's money had paid for it, and that the deed from
Martin and wife was made to complainant.    James A. Doan
testifies that in a conversation with him, in May, 1883, old
man Pry told witness that William Pry wrote to him to buy
the land and have it deeded to complainant and Hamilton
Pry, and that he did so; that William Pry afterwards came
home from the army, and on being shown the deed, said it
was all right,—and this statement is corroborated by the tes-
timony of William Pry.    Mary Neal, daughter of old man
Pry, testifies she heard him say the deed was made to Ham-
ilton and John W. Pry, and he aimed for them to have it,
and that he aimed to pay witness for her interest in the place.
The testimony of this witness we regard as important in more
than one respect.    The circumstances which she states as
having led to the conversation, in our judgment, greatly
increase the probability of its truth, while at the same time
it shows the alteration of the deed had become a matter of
discussion in the family, and from this fact alone it is but
reasonable to presume that all the family had become cogni-
zant of the fact.    It is very clear the sister understood that
she had an interest in the land as heir of her brother, and
assuming the deed under which her father claimed was a

forgery, it was very natural he should be willing to pay her the amount of her interest in the land in order to quiet her, and prevent further discussion of the matter. David N. Willard swears that in 1863 or 1864 he was at the shop of old man Pry, and that while there he told witness he had received a letter from William Pry, directing him to buy a piece of land, and to make the deed to complainant and Hamilton Pry, and offered to show witness the letter, but witness did not read it. William Pry testifies that he wrote to his father, some time in 1864, to sell his property then in his father's possession, and invest the proceeds in land; that his father replied, by letter, he could get the land in controversy, whereupon witness wrote again, directing him to buy it, and have the deed made to complainant and Hamilton Pry, and that his father replied he had done so; that in 1865, a few months after this correspondence, witness returned home on a furlough, when his father again informed him that he had bought the land, and had the deed made to Hamilton and John W. Pry, as witness had directed, and at the same time showed him a deed for the land from Martin and wife to Hamilton and John W. Pry, as he had stated, and that at that time there were no interlineations or erasures on it; that he next saw the deed in 1871, when he found the name of Hamilton Pry, and the "W" in complainant's name, had in the meantime been erased. John Pry, Jr., was examined as a witness on behalf of the defendants, but his testimony is of little value, one way or another, except that it shows he was aware of the fact the deed in question had been changed from the way it was originally written, at the time of his purchase, in 1872.

The case thus made by the complainant is certainly a strong one, and the evidence relied on to overcome it consists almost exclusively of the testimony of John Pry, Sr., the perpetrator of the alleged forgery. Assuming he is guilty of the offence imputed to him, it is hardly to be expected he would admit

it.  He does not.   On the contrary, he denies it in very em-
phatic terms.   Nevertheless, when we look at his answer, and
examine his testimony in the light of his own admissions,
it is established, beyond all reasonable doubt, the strength
of his denial is greatly impaired.   He testifies, in substance,
that after considerable correspondence between himself and
William Pry, the latter, in his last letter, told him to have
the deed made to John W. Pry, or to himself, as he might
prefer; that the deed was prepared at Benton, in the clerk's
office, by Calvin M. Clark; that by the witness' direction
Clark commenced preparing the deed, and when about done,
one Kin Harrell came in, and suggested it would be better to
have the deed made out to the witness himself, and that upon
consultation between the parties present it was determined
to have the deed made that way; that thereupon Clark, the
scrivener, made the erasures and interlineations in the deed
as they now appear upon the face of it; that this was done
in the presence of Martin and wife, Kin Harrell, and witness,
all of whom, including the scrivener, are dead, except witness.
He further states that all that was stated by witness Willard
in his testimony in this cause is true, who, it will be remem-
bered, swore that in 1863 or 1864 John Pry, Sr., told him
that he had received a letter from William Pry, directing him
to have the deed made to John W. and Hamilton Pry.

Now, if, as claimed by the old man in his testimony, he
got a subsequent letter directing him to take the deed in
complainant's name, or in his own name, as he might pre-
fer, it is somewhat strange that he should, notwithstand-
ing this change in his son's orders to him, have directed
Clark in the first place to make it to complainant and Ham-
ilton Pry, as first directed, for by William's last order, as
claimed by the old man, Hamilton was to be left out alto-
gether.   In ordering the deed thus made out he certainly did
not pay much respect to William's last order on the subject.
In the old man's answer he claims he had the land conveyed

to himself for the reason, in part, that he was paying one-half of the consideration, while his testimony shows that he paid no part of it. Again, while he states, in his examination in chief, the deed was about done when Harrell came up and suggested it would be better to have it made to witness, yet in his cross-examination, in which he assumes to give the exact particulars of the transaction, he says: "Cal (meaning Clark) was writing Hamilton's name, when Kin Harrell told him to stop," and in his examination in chief he says, as we have already seen, that Clark thereupon did stop, and the alterations and erasures in the deed were made; yet upon looking at the deed itself, which is before us, we find the name of Hamilton Pry appears in it but once, and that at the commencement, nevertheless the erasures of the pronouns representing the two grantees continue all through the deed. If, as witness claims, Clark was stopped in the act of writing Hamilton's name, how is it we find erasures below his name,—indeed all through the instrument?

It is also a significant fact that the deed should have been withheld from record until in 1872, without some satisfactory explanation showing why it was done. The only reason assigned for it by the witness is, that he did not have the money with which to pay the recording fee, and that he thought it was William's place to have it done. Surely the use of a farm and home that never cost witness a cent, for five or six years, ought to have enabled him to save enough out of the rents and profits to pay for the recording of a single deed. The reason which he assigns is manifestly too puerile to receive serious consideration. It is also a singular coincidence, worthy of note, that all the persons named by witness as having been present when these alterations in the deed were made are *dead,* and can not therefore be called, either to sustain or contradict him. On the other hand, the testimony of one or two of complainant's witnesses is also open to criticism, notably that of William Pry, whose conduct in

the affair and connection with the suit it must be confessed are anything but creditable to him, and subject his testimony to just suspicion. But after making all due allowance for this, his statement in the main is too strongly corroborated to reject it altogether for that reason.

In any view we are able to take of the evidence, after giving due weight to every objection which has been or can be justly urged against it, we fully agree with the circuit court in holding the alteration of the deed in question occurred after, and not before, its execution and delivery.

Having determined that the case made by the bill has been sufficiently proven, as was found by the circuit court, we start out with the admitted proposition that the complainant, when an infant about three years of age, by virtue of the deed from Martin and wife, acquired the absolute fee simple title to an undivided half of the land in controversy, and it is not claimed that he has ever made any conveyance of his interest therein, or that his right of recovery is barred by any statute of limitations, or that he is in any manner estopped by anything he has said or done from asserting his rights thereto; and also with the further conceded fact that the source of title of all the defendants claiming adversely to him, is a deed from one who had no title whatever, either legal or equitable, and whose only claim of title was and is based upon a forgery committed against complainant, while an infant.

The decree dismissing the bill as to all the defendants except John Pry, Jr., we understand, as already stated, to be based solely on the ground they were purchasers for value, without notice of the want of title in John Pry, Sr., through whom they claim. Conceding this to be so, upon what principle can these claimants be said to have a better standing in a court of equity than the complainant? By the execution of the Martin deed to the latter he became clothed with both the legal and equitable title to the premises, and as we have

already seen, he has never disposed of either, or in any manner forfeited his right thereto. This clearly can not be said of the grantees of John Pry, Sr., or those claiming through him, for as to the undivided half of the land now in controversy he had neither the legal nor the equitable title,—in short, as to this interest in the land he had no title at all, and therefore he could confer none on them. Even if we were to concede defendants had an equally good equitable title with complainant, still, the position of the latter would be the better, on two distinct grounds, well recognized in equity, namely: his equitable title is prior in time, and he also has the legal title. It is true that under the operation of our recording laws a prior unrecorded deed will be postponed to a subsequent deed in the same chain of title, where the latter has been first placed upon record; and such would be the case here, if these defendants were claiming under a subsequent deed made by Martin and wife, which had been first filed for record. The reason of this is, the statute expressly makes all unrecorded deeds and other instruments affecting the title to land, *void* as to subsequent purchasers and creditors without notice. But this provision has no application to forged instruments, for they can not affect a title one way or the other, and are therefore not entitled to record. It would be a dangerous doctrine, indeed, to hold that one, by forging a deed from his neighbor to himself, and putting it upon record, could then, by conveying to a third party having no notice of the forgery, confer upon the latter a good title, merely because the record showed the title in the forger. If such were the law, no man's title would be safe. The principles of justice and public policy alike forbid the adoption of such a rule.

It follows, therefore, the circuit court erred in dismissing complainant's bill as to part of the defendants, on the ground suggested, and the decree in that respect will therefore have to be reversed. The conclusion here reached is fully sus-

tained by the following authorities, and others that might be cited: *Pensonneau et al.* v. *Bleakley et al.* 14 Ill. 15 ; *Chandler* v. *White et al.* 84 id. 435 ; *Baird et al.* v. *Jackson,* 98 id. 78 ; *Buckman* v. *Dicker,* 8 C. E. Green, 283 ; *Arrison* v. *Harmstead,* 2 Barr, 191 ; *Van Amringe* v. *Morton,* 4 Whart. 382.

It is objected by defendants in error, that the allegation in the bill that the land was conveyed to complainant and Hamilton Pry, jointly, is not supported by the proofs, for, as is alleged, the deed under which they claim shows they took as tenants in common, and not as joint tenants, and consequently hold by several titles. Technically considered, this is true, and it is conceded the allegation would have been more accurate if the bill had alleged the conveyance was made to them as tenants in common, or simply that the conveyance was made to them, without undertaking to define the legal effect of the conveyance ; but the error is of such a technical character it ought not to be permitted to defeat a recovery, especially where the objection is made for the first time in this court, as is the case here. In the popular sense of the term, the conveyance was made to them jointly, though in law they took several titles. Where a technical error of this kind is relied on, the party intending to avail himself of it should make the objection in the court below, so as to afford his adversary an opportunity to amend, and if he does not do so he will be deemed to have waived it. Of course, this rule has no application where a material allegation has been omitted, or where the error goes to the substance or merits of the controversy. The present case is one of a defective allegation, merely.

As this case will have to be remanded, we deem it proper to call attention to certain errors or mistakes in the description of some of the property in controversy, as the same is given in some of the conveyances through which a part of the defendants claim, which seem to have escaped the notice of counsel. It may be, however, these errors have occurred

in the complainant's bill only. We do this to afford the parties interested an opportunity of correcting the errors, however they may have occurred, if they desire to do so.

It will be kept in mind the land in controversy is the south-east quarter of the section, and that the deed from John Pry, Sr., to William Pry, of the 2d of March, 1865, was for the west eighty. After showing the conveyance of this eighty, the bill then charges that John Pry, Sr., on the 20th of September, 1871, made another deed to William Pry, conveying to him an additional fifteen acres, described as follows: "Commencing at the N. W. of the N. W. S. E. of Sec. 19," etc., "and running south," etc. Assuming the description of the land is properly stated in the bill, it is clearly void for uncertainty. According to the calls, the starting point would be at some point on the ten acres lying in the north-west corner of the north-west quarter of the south-east quarter, which would, in any event, throw two-thirds of the fifteen acres on the west eighty, which had already been conveyed to William Pry in 1865, as we have heretofore seen, or the whole of the fifteen acres might be on that eighty, depending upon the starting point chosen, which is left wholly uncertain. From other conveyances, however, we have no doubt what was intended to be said was, "commencing at the north-east corner of the north-west quarter of the south-east quarter, and running thence south," etc.

So of twenty acres of the land attempted to be conveyed to John Pry, Jr. It is described as "the S. $\frac{1}{2}$ of the N. E. $\frac{1}{4}$ of the S. E. $\frac{1}{2}$." This description is also void for uncertainty. The expression, "S. E. $\frac{1}{2}$," doubtless should have been the "S. E. $\frac{1}{4}$." And in conveying to him the south-east quarter of the south-east quarter, in the same deed, five acres are excepted out of the south-east corner of that forty, which do not seem to have ever been conveyed by John Pry, Sr.

Upon looking into the case of *John Pry, Jr.* v. *John W. Pry et al.* (No. 40, of the same docket and term of the present

case,) we find it to be an appeal from the same decree.  The appellant in that case and the plaintiff in error in this case both seek to reverse the decree in part, but in different respects and for different reasons.  For convenience we have considered the two cases together, and in doing so have treated the errors assigned by John Pry, Jr., in No. 40, as cross-errors in No. 22,—the present case.

It follows from what we have said, the decree of the court below, in so far as it awarded relief as against John Pry, Jr., was proper, and to that extent it is affirmed; but in dismissing the bill as to the other defendants it was erroneous, and in this respect the decree is reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Decree modified.*